**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CHARLES BREWER,** *et al.***,** | Case No.: 11-CV-3587 YGR |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CALIFORNIA CLASS AND GRANTING DEFENDANT'S MOTION TO DECERTIFY FLSA COLLECTIVE ACTION** |
| v. | |
| **GENERAL NUTRITION CORPORATION,** | |
| Defendant. | |

## I.   INTRODUCTION

Defendant General Nutrition Corporation ("GNC") is a retailer of nutritional products such as vitamins and herbal supplements.  Plaintiffs Charles Brewer, Jessica Bruns, Michael Mitchell, Michael Murphy, and Wayne Neal are five former GNC employees who held positions as Sales Associates and/or Assistant Managers at GNC retail stores.  This civil action arises from GNC's alleged failure to compensate putative classes of Sales Associates and Assistant Managers for time worked after store closing hours while performing "closing tasks" such as making off-site bank deposits, as well as alleged failures to pay overtime, supply meal and rest breaks, reimburse for mileage, issue final paychecks within statutorily prescribed time limits, or provide wage statements that comply with California law.

Now before the Court are plaintiffs' Motion to Certify eight putative classes pursuant to Federal Rule of Civil Procedure 23 (Dkt. No. 106); and GNC's Motion to Decertify a collective action that the Court, in January 2013, initially certified under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") (Dkt. No. 168).[1]

---

[1]  The Court resolves the five administrative motions to seal documents submitted in connection with the substantive motions via separate order entered this date.

Having considered the papers in support of an in opposition to the motions and the relevant authorities, and having had the benefit of oral argument, for the reasons set forth below the Court **ORDERS** that the Motion to Certify is **GRANTED IN PART AND DENIED IN PART** and the Motion to Decertify is **GRANTED**.  With respect to the Motion to Certify, the Court finds as follows:

(1) As to Plaintiffs' proposed Wage Statement Class, Meal Period Subclass, Rest Period Subclass, and Reimbursement Subclass the motion is **GRANTED** on the grounds that they present common questions of law and fact, making them appropriate for class treatment.

(2) As to plaintiffs' proposed Final Pay Subclass, the motion is **GRANTED IN PART** with respect to the portion of the class members who were: (a)  involuntarily discharged; and (b) who quit and were paid by direct deposit.

(4) The motion is **DENIED** as to plaintiffs' proposed Off-the-Clock and Records Subclasses because they do not meet the commonality and predominance requirements of Rule 23.

(5) The motion is **DENIED** as moot as to the Unfair Competition Class since it is redundant of the Class and Subclasses otherwise certified by the Court.

Finally, and reasons similar to those establishing that the Off-the-Clock and Records Subclasses do not meet the commonality and predominance requirements, the Court finds that persons who have opted in to the FLSA collective action are not similarly situated.  As a consequence, GNC's Motion to Decertify the FLSA Collective Action is **GRANTED**.

## II.    BACKGROUND

### A.    FACTUAL BACKGROUND

The Court summarizes the general factual background.  GNC sells health and wellness products in over 2,900 retail stores nationwide, with over 200 such stores in California.  Some stores are set inside enclosed malls, some in strip malls, and some stand alone.  Regardless of location, each GNC retail store has a point of sale ("POS") computer that serves as both the store's cash register and the time clock for employees to record their working hours.  (Scott Decl. ISO Decert.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Mot. ¶ 7; Germaise Decl. ISO Cert. Opp'n, Exh. A ("Wunschel Depo."), at 73:23-74:2.)[2]

2    Employees cannot make sales without being logged in to the POS.  They clock in at the start of their

3    shift, clock out and back in for any meal break, and then clock out at the end of the day on the POS.

4    GNC requires employees to review their time records on a weekly basis and sign a document

5    attesting to their accuracy.

6        When closing a store for the evening, the GNC employee (or, sometimes, employees)

7    working the closing shift must perform certain tasks.  These tasks are set by company policy,

8    enumerated in a checklist, and appear to be uniform nationwide.[3]  Some of the tasks, including

9    taking deposits to the bank, occur after the closing shift employee clocks out.

10   _____

11       [2]  The parties submitted several declarations in support of their briefs.  Plaintiffs submitted
     the joint declaration of their counsel in support of their Certification Motion (Dkt. No. 107 ("Joint

12   Cert. Decl.")), a supplemental joint declaration in reply (Dkt. No. 167-1 ("Supp. Joint Cert. Decl."),
     and a joint declaration of counsel in support of their Decertification Opposition (Dkt. No. 174-1

13   ("Joint Decert. Decl.")).  In opposition, GNC submitted the declarations of its counsel (Dkt. No. 159
     ("Germaise Decl. ISO Cert. Opp'n)), Division Sales Director Paul Katz (Dkt. No. 160 ("Katz

14   Decl.")), and Training and Field Communication Manager Thomas Scott (Dkt. No. 161 ("Scott
     Decl. ISO Cert. Opp'n")).  In support of its Decertification Motion, GNC submitted declarations of

15   Scott (Dkt. No. 169 ("Scott Decl. ISO Decert. Mot.")), Senior Director of Employee Relations
     Jennifer Eck (Dkt. No. 170 ("Eck Decl.")), and counsel (Dkt. No. 171 ("Germaise Decl. ISO Decert.

16   Mot.")).

17

18       [3] Closing tasks include:
     •  Do any pickups if necessary and log them on deposit log

19   •  Complete nightly Shrink Count
     •  Block and face store. . . .

20   •  Sweep and mop floor as necessary
     •  Empty and take out any garbage

21   •  Print off individual cashier reports and dept/class activity report
     •  Press end of day count down register. . . .

22   •  Remove and enter all checks (including traveler's checks) from the drawer
     •  Remove receipts . . . under till and sort by type

23   •  Set up deposit
           o  Fill out Deposit Slips and Deposit Log

24         o  Subtract starting bank from total cash counted
           o  Remove deposit amount from register . . .

25         o  Add checks to deposit
           o  Add any pickups done throughout the day to total depo[sits]

26   •  Clock out
     •  Fill out nightly tracking sheets and recap envelope

27   •  Turn off lights and make sure back door is secure
     •  Lock gate/door(s) and take deposit directly to the bank

28   (Joint Decert. Decl., Exh. 6, at p. 120 of 194 ("Closing Procedures Checklist").)

When closing shift employees log out of POS for the day, the POS prompts them to enter a "clock-out" time.  The POS permits those closing employees to enter a clock-out time that is later than the time they actually log out of the POS.  For example, an employee logging out of the POS at 8:20 p.m. could enter a clock-out time of 8:45 p.m.

**B.    PLAINTIFFS' CLAIMS AND PROPOSED CLASSES**

Plaintiffs filed their original complaint on July 21, 2011, alleging a variety of wage and hour claims.  After several amendments, the operative Third Amended Complaint (Dkt. No. 85, "TAC") asserts nine claims, eight arising under California law and one under federal law.  As enumerated in the TAC, they are:

(1) Failure to Properly Compensate Employees for All Hours Worked (Labor Code §§ 200, 226, 500, 510, 1197, 1198)[4]

(2) Failure to Furnish Wage and Hour Statements (Labor Code §§ 226(e), 226.3)

(3) Failure to Maintain Employee Time Records (Labor Code § 1174(d))

(4) Unfair Competition (Bus. & Prof. Code § 17200 *et seq.*)

(5) Labor Code Private Attorney General Act (Labor Code § 2698)

(6) Failure to Provide Overtime Pay (Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"))

(7) Failure to Provide Meal and Rest Periods (Labor Code § 226.7, 512; Industrial Welfare Commission ("IWC") Wage Order No. 7-2001, "the Wage Order")[5];

(8) Waiting Time Penalties (Labor Code §§ 201-203)

(9) Failure to Reimburse Expenses (Labor Code § 2802)

In their motion, Plaintiffs seek certification of two classes and six distinct sub-classes—that is, one class or subclass for each state-law claim.  Plaintiffs' motion defines the classes and subclasses as follows:

---

[4] Unless otherwise indicated, statutory citations refer to California codes.

[5] The Court notes that the Third Amended Complaint references both IWC Wage Order No. 5-2001 and IWC Wage Order No. 9-2001, but the motion refers to the applicable IWC Wage Order as Wage Order No. 7-2001 which regulates the mercantile industry.

United States District Court
Northern District of California

(1) Wage Statement Class: All non-exempt hourly employees of GNC who worked as Sales Associates and/or Assistant Managers in California from July 21, 2007, to the present.[6]

    a.  Final Pay Subclass: All members of the Wage Statement Class whose employment was (1) involuntarily terminated and who were not paid final wages immediately or (2) voluntarily terminated and who were not paid final wages within 72 hours of termination.

    b.  Meal Period Subclass: All members of the Wage Statement Class whose "punch data" reveals at least one untimely, truncated and/or missed meal period.

    c.  Rest Period Subclass: All members of the Wage Statement Class whose "punch data" reveals at least one untimely, truncated and/or missed rest period.

    d.  Off-the-Clock Subclass: All members of the Wage Statement Class who worked at least one closing shift.

    e.  Records Subclass: The Records Subclass is coextensive with the Off-the-Clock Subclass.

    f.  Reimbursement Subclass: All members of the Wage Statement Class who worked at least one closing shift and who used an automobile to make a bank deposit.

(2) Unfair Competition Class: The Unfair Competition Class is coextensive with the Wage Statement Class and all Subclasses.

(Cert. Mot. at 13-14.)

With respect to plaintiffs' FLSA claim, on January 7, 2013, the Court conditionally certified plaintiffs' proposed FLSA collective action as pleaded in the then-operative Second Amended Complaint.  (Dkt. No. 33 ("SAC"); Dkt. No. 68 ("FLSA Cert. Order") at 6.)  The SAC defined the FLSA Collective Action as follows:

All non-exempt hourly employees of GNC who worked the closing shift and/or worked shifts where employees worked by themselves as Sales Consultants and/or Assistant Managers from July 21, 2007, to the date of filing this Complaint . . . .

    a.    All employees of GNC who worked as Sales Consultants and/or Assistant Managers in states that do not have the same or

---

[6]  The date of filing of the original complaint, July 21, 2011, establishes the basis for the class period.  Certain of plaintiffs' claims have statutes of limitations of one and three years.  However, each of the claims is a predicate for plaintiffs' UCL claim, as to which the applicable statute of limitations is four years.  Cal. Bus. & Prof. Code § 17208.  Consequently, plaintiffs allege a class period beginning four years prior to the filing of the original complaint, or July 21, 2007, which the Court finds appropriate at this juncture.

United States District Court
Northern District of California

similar break/meal period laws as California who took uncompensated but interrupted meal periods from July 19, 2007 to the date of filing this Complaint. . . .

b.      All employees of GNC who worked as Sales Consultants and/or Assistant Managers who performed closing shift duties and therefore worked after their shift ended from July 21, 2007 to the date of filing this Complaint.

(SAC ¶ 22.)  Since the issuance of the FLSA Certification Order, plaintiffs have sent opt-in notices to over 20,000 GNC employees.  Approximately 1,400 employees have opted in.

## III.    PLAINTIFFS' CERTIFICATION MOTION

### A.    APPLICABLE STANDARD

Class certification under Rule 23 is a two-step process.  First, the Court must determine that the proposed class meets all the prerequisites to certification in subpart (a) of Rule 23: numerosity, commonality, typicality, and adequacy.  Second, the Court must determine that the proposed class meets at least one of the criteria set forth in subpart (b) of Rule 23.

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).  "The United States Supreme Court requires district courts to engage in a 'rigorous analysis' of each Rule 23(a) factor when determining whether plaintiffs seeking class certification have met the requirements of Rule 23."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)); *see also Dukes*, 131 S.Ct. at 2551-52. The Court considers the merits to the extent that they overlap with the Rule 23(a) requirements. *Ellis*, 657 F.3d at 980 (citing *Dukes*, 131 S. Ct. at 2551-52).  To satisfy itself that class certification is proper, the Court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties.  *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975). The Court must resolve factual disputes to the extent "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*."  *Ellis*, 657 F.3d at 983 (emphasis in original).  "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'"  *Aburto v. Verizon Cal., Inc.*, 2012 WL 10381, at *2 (C.D. Cal.) (quoting *Ellis*, 657 F.3d at 982).  Ultimately,

the district court must exercise its discretion to determine whether a class should be certified. *Califano v. Yamasaki,* 442 U.S. 682, 703 (1979); *see also Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 939, 944 (class certification is a matter within district court's discretion).

In this case, plaintiffs seek certification of their California law claims pursuant to Rule 23(b)(3), the predominance standard.  To certify a damages class under Rule 23(b)(3), the party seeking class certification must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The shared legal or factual issues must be of sufficient importance to the case that the Court is convinced that the most efficient, fair, and sensible method of adjudication is through a class action.  *See Califano*, 442 U.S. at 701.  Therefore, the predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (internal quotation marks omitted)).  Where questions common to class members represent significant issues that can be resolved in a single adjudication, "there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Id.* (internal quotation marks and citation omitted).

### B.   ANALYSIS

GNC concedes that plaintiffs "meet Rule 23(a)'s numerosity, typicality, and adequacy of representation requirements" (Cert. Opp'n at 10 n.1).  The Court concurs.  First, with respect to numerosity, the undisputed evidence proffered here demonstrates that there are more than 7,000 class members in plaintiffs' overall Wage Statement Class and "thousands" of members in each subclass.  (*See* Joint Cert. Decl., Exhs. 18, 29, 31, 37-38.)  The class members are, therefore, "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Similarly, the typicality requirement is met because the evidence establishes that the named plaintiffs "possess the same interest and suffer the same injury" as the absent class members.  *Falcon*, 457 U.S. at 156 (citation omitted); *Hanlon v. Chrysler Corp*., 150 F.3d at 1020 (representatives' claims are typical if they are "reasonably co-extensive with those of absent class members").  Finally, Rule 23(a)(4)'s

United States District Court
Northern District of California

7

requirement of adequate representation is met, in that no conflicts of interest between the class representatives and absent class members appear, and both the class representatives and class counsel have prosecuted this action vigorously over the three years of its pendency.

Thus, the Court evaluates the only remaining factors, namely Rule 23(a)(2)'s requirement of "questions of law or fact common to the class," and Rule 23(b)(3)'s requirement that those common questions predominate.  As to the first requirement, "commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'"  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Dukes*, 131 S.Ct. at 2551).  "[T]he key inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather, whether class treatment will 'generate common *answers* apt to drive the resolution of the litigation.'"  *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Dukes*, 131 S.Ct. at 2551) (emphasis supplied).  As to the predominance requirement, "[t]hough there is substantial overlap between the two tests, the 23(b)(3) test is 'far more demanding' . . . and asks 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem*, 521 U.S. at 623-24)); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

The Court examines the commonality and predominance issues for each of Plaintiffs' proposed classes and subclasses in turn.  Because the Rule 23(b)(3) predominance inquiry subsumes the Rule 23(a)(2) commonality inquiry, and for the sake of efficiency, the Court analyzes commonality and predominance together in the context of each proposed class and subclass.  *See Amchem*, 521 U.S. at 609 (focus on Rule 23(b)(3) appropriate since it subsumes or supercedes the Rule 23(a)(2) requirement).

### 1.   *Wage Statement Class*

Plaintiffs define their proposed Wage Statement Class as including "[a]ll non-exempt hourly employees of GNC who worked as Sales Associates and/or Assistant Managers in California" during the class period.  The legal violation at issue for the Wage Statement Class is based on Labor Code section 226(a), which provides, in pertinent part:

1
2
3

> Every employer shall . . . furnish each of his or her employees . . . an accurate itemized statement in writing showing . . . (2) total hours worked by the employee . . . (6) the inclusive dates of the period for which the employee is paid . . . and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . .

4
5
6
7
8
9
10

Cal. Lab. Code § 226(a).  Labor Code 226(e)(1) authorizes plaintiffs to recover either actual damages or statutory damages of "fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000)," plus attorneys' fees.  Cal. Lab. Code § 226 (e)(1).  An award of penalties under the statute is available to those employees who "suffer[] injury as a result of a knowing and intentional failure by an employer to" issue compliant wage statements.  *Id.*

11
12
13
14
15
16
17

Plaintiffs allege both direct violations of section 226 and derivative violations based upon their claims for additional hours due to off-the-clock work and missed meal and rest breaks.  In support of certification of the direct section 226 violation claims, Plaintiffs submit evidence showing the two forms of wage statements issued to putative members of the Wage Statement Class during the relevant time period.  (Joint Cert. Decl., Exhs. 24, 25, 26.)  These wage statement exemplars show that GNC failed to include the inclusive pay period and overtime rates of pay, as required by subsections (a)(6) and (a)(9).

18
19
20
21
22
23
24
25
26
27
28

GNC's only argument in opposition to the certification of these direct violations is that plaintiffs cannot show any injury due to omission of this information.  The Court disagrees.  Labor Code section 226 was amended effective January 1, 2013, to specify that an employee is "deemed to suffer injury…if the employer fails to provide accurate and complete information as required…and the employee cannot promptly and easily determine from the wage statement alone" the information required to be provided, including the inclusive dates of the pay period, the total hours, and all applicable hourly rates in effect during the pay period, among other things.  Cal. Labor Code §226(e)(2)(B)(i).  The statute further provides: "'promptly and easily determine' means a reasonable person would be able to readily ascertain the information without reference to other documents or information."  Cal. Labor Code § 226(e)(2)(C).  GNC's citation to cases that preceded this amendment are, therefore, inapposite.  Because the wage statements are uniform across the class

with respect to these alleged violations of the statute, and proof of injury is based upon what a "reasonable person" would understand from the face of those wage statements, the issues of fact and law to be determined on these claims are both common and predominant.

Plaintiffs' derivative violations—arguing that the wage statements fail to show total hours worked because they leave out off-the-clock hours—rise or fall based upon the viability of the Off-the-Clock, Meal Period and Rest Period Subclasses. As discussed below, the Court finds the Meal and Rest Period Subclasses to be appropriate for certification, further supporting class certification of employees' claims of a wage statement violation based upon failure to account for those unpaid premiums. *See Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1156 (2012), *as modified on denial of reh'g (Jan. 8, 2013), review denied (Mar. 20, 2013)* ("To the extent [plaintiffs' wage statement and waiting time penalties] claims were based on plaintiffs' overtime and/or meal-and-rest-break claims, the court should have granted class certification on these claims")

### 2. *Meal and Rest Period Subclasses*

The Meal Period and Rest Period Subclasses are defined as including Sales Associate and Assistant Manager employees whose time records show "at least one untimely, truncated, and/or missed" meal period or rest period. To analyze this proposed subclass, the Court relies on Labor Code section 226.7 which provides, in pertinent part: "An employer shall not require an employee to work during a meal or rest… period mandated pursuant to an… order of the [IWC]…." Labor Code § 226.7(b). The Wage Order, in turn, requires employers to provide 30-minute meal periods and paid 10-minute rest periods depending upon the length of the employee's workday.[7] (Wage Order, § 11.) Under section 11(D), an employer's failure to provide compliant meal periods requires that the employer pay a premium of one hour's pay at the regular rate "for each workday that the meal period is not provided." Similarly, section 12(B) requires that the employer pay one hour's pay at the regular rate for failure to provide an employee a paid rest period. (Wage Order, § 12(B).)

---

[7] In pertinent part, section 11 of Wage Order 7 requires a 30-minute meal period for any employee who works more than 5 hours, unless the day's work will be over after 6 hours and both employer and employee consent to waive the meal period. Wage Order 7 also requires, generally, that employees who work more than three and one-half hours be given a 10-minute paid rest break every four hours.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs offer two bases for class treatment of their alleged meal and rest break violations:

2 (1) Defendants improperly obtain an on-duty meal period waiver from nearly every putative class

3 member; and (2) GNC has a blanket policy that "does not authorize and permit meal or rest breaks

4 unless customer volume, scheduling and business needs permit," such that employees pressured not

5 to take breaks and are never compensated for missed breaks.  The Court finds that plaintiffs have

6 proffered evidence sufficient to show the propriety of class treatment on both bases.  GNC's use of

7 the on-duty waiver applies to all class members, and the propriety of its use can be determined on

8 common proof.  Likewise, plaintiffs' evidence indicates that GNC's employee policies and

9 scheduling practices make it exceedingly difficult to take meal and rest breaks, as GNC knows from

10 its own POS data, yet GNC has not paid the missed meal and rest break premiums required by the

11 Labor Code when such breaks were missed.

12    GNC's policies expressly contemplate that employees may not be able to take scheduled

13 meal breaks.  (Katz Decl., Exhs. A, B.)  GNC's employee handbook states:

14       Due to the unpredictability of customer flow, lunch periods and breaks
         are not strictly scheduled, except where required by law, and will vary
15       depending on customer volume and other factors.  You are expected to
         be flexible and cooperate with your supervisor in taking lunch periods
16       and breaks at a time when there will be the least interference with
         scheduling and business.
17

18 (Joint Cert. Decl., Exh. 32, at 27.)  GNC, as a matter of policy and practice, distributes the on-duty

19 meal break waiver forms to all newly hired Class Members. (Joint Cert. Decl., Exh. 5, Inlow Depo.,

20 at 69:3- 71:8.)  Nearly all class members sign the waiver forms at the time of hiring, in which they

21 purportedly acknowledge that the "nature of [their] work with GNC may make it difficult for [them]

22 to be relieved of all duties during a meal period" and that meal periods in which they work shall be

23 "considered an 'on duty' meal period and counted as time worked."  (Joint Cert. Decl., Exh. 22

24 (compendium of over 7,600 waiver forms produced by GNC in discovery); *id.*, Exh. 23 (example

25 waiver form); *id.*, Exh. 5, Inlow Depo., at 69:3-70:20 (Division Sales Director testifying that

26 employees fill out waiver forms "at their time of hire").)  GNC requires employees to clock out and

27 back in for breaks.  (*See* Eck Decl., Exh. D.)

28

1      In discovery, GNC produced "punch data" from its POS system for all Class Members from

2  approximately January 1, 2007, to October 31, 2013.  That data shows when and whether the

3  employees clocked in and out for meal periods as required.  (Joint Cert. Decl., Exh. 18, 19.)

4  Plaintiffs' expert, Dr. Kane, analyzed this data to determine the percentage of shifts when employees

5  either did not clock a meal or rest period, or the meal/rest period was cut short of the required time.

6  His analysis of the data indicates that meal period violations occur in about one third of shifts and

7  rest break violations occur in about 80% of shifts.  (Kane Report at 2-5.)  GNC concedes that it has

8  not made any premium payments to any Class Members for missed meal and rest periods.  (Joint

9  Cert. Decl., Exh. 15 [Interrogatory Nos. 26-29]; Exh. 12 [Admission Nos. 1 & 2].)  Plaintiffs further

10  submit evidence that, in an effort to appear compliant with wage and hour laws, GNC routinely

11  modified Class Member "punch data" post hoc, so that employees' time records would display a

12  break even though they were not given one.  (Joint Cert. Decl. ¶ 42 [citing class member

13  declarations]; Exh. 8, Bruns Depo. at 56:06-59:04, 62:13-62;22 & 64:02-64:05; Exh. 9, Mitchell

14  Depo. at 53:01-54:17 & 38:04-38:11; Exh. 10, Murphy Depo. at 31:13-42:18; Exh. 11, Neal Depo.

15  24:14-28:25 & 46:20-49:15.)

16      The Ninth Circuit, interpreting California law, has held that the "on-duty" meal period is a

17  limited alternative to the off-duty meal period requirement, and can only be used employers in the

18  narrowest of circumstances, based upon the "nature of the work."  *Abdullah, supra,* 731 F.3d at 959.

19  Generally, the nature of the work exception has been applied in two circumstances: "(1) where the

20  work has some particular, external force that requires the employee to be on duty at all times, and

21  (2) where the employee is the sole employee of a particular employer."  *Id.* at 959.  The Ninth

22  Circuit found certification appropriate where a company has uniform policy of requiring all

23  employees to execute these waivers at hiring, since the evidence needed to establish the legality of

24  the waiver, "will yield a common answer that is 'apt to drive the resolution of the litigation,' as

25  required by Rule 23(a)(2)."  *Id.* at 962 (*citing Wal-Mart*, 131 S.Ct. at 2551).  The Ninth Circuit thus

26  affirmed class certification for the question of whether an employer "can invoke a 'nature of the

27  work' defense on a class-wide basis, where the need for on-duty meal periods results from its own

28  staffing decisions."  *Id.* at 963.  Similarly, the California Court of Appeals, following from the

United States District Court
Northern District of California

California Supreme Court's decision in *Brinker*, has held that class certification is appropriate where the employer required "blanket off-duty meal break waivers in advance from all security guard employees, regardless of the working conditions at a particular station," since the employer itself "treated the off-duty meal break issues on a classwide basis." *Faulkinbury v. Boyd & Associates*, 216 Cal.App.4th 220, 234 (2013).

The California Supreme Court in *Brinker* held that an employer satisfies its obligations to provide meal breaks if "it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal. 4th at 1040. Certainly, employers are only required to provide meal and rest periods, not to police them. *Id.* However, as the majority opinion in *Brinker* stated, "an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." *Id.* (citing cases). "The wage orders and governing statute do not countenance an employer's exerting coercion against the taking of, creating incentives to forgo, or otherwise encouraging the skipping of legally protected breaks." *Id.* Thus, for instance, even if an employer has a formal policy that is compliant with California law, proof of an informal but common scheduling policy that makes taking breaks extremely difficult, or other informal means of exerting pressure to discourage taking meal and rest breaks, would be sufficient to establish liability to a class. *Id.*

The concurring opinion in *Brinker*, authored by Justice Werdegar, took pains to clarify that "the opinion of the court does not endorse [the employer's] argument, accepted by the Court of Appeal, that the question *why* a meal period was missed renders meal period claims *categorically* uncertifiable." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1052 (2012) (concurrence by Werdegar and Liu) (emphasis supplied). To the contrary, "[i]f an employer's records show no meal period for a given shift over five hours, a *rebuttable presumption* arises that the employee was not relieved of duty and no meal period was provided. This is consistent with the policy underlying the meal period recording requirement, which was inserted in the IWC's various wage orders to permit enforcement." *Id.* at 1053 (emphasis supplied); *see also Seckler v. Kindred Healthcare Operating Grp., Inc.*, No. SACV 10-01188 DDP, 2013 WL 812656, at *8 (C.D. Cal. Mar. 5, 2013)

United States District Court
Northern District of California

1  ("This court has previously indicated its agreement with Justices Wedegar and Liu that if a meal

2  period is not taken by the employee, the burden falls on the employer to rebut the presumption that

3  meal periods were not adequately provided," citing *Brinker*).  "Otherwise, employers would have an

4  incentive to ignore their recording duty, leaving employees the difficult task of proving that the

5  employer either failed to advise them of their meal period rights, or unlawfully pressured them to

6  waive those rights."  *Ricaldai v. U.S. Investigations Servs., LLC,* 878 F.Supp.2d 1038, 1044

7  (C.D.Cal.2012).

8      GNC argues that the time records of class members cannot support class certification

9  because the court would need to determine not only whether breaks were missed but *why* they were

10  missed before liability can be established.  GNC contends that five depositions of randomly-selected

11  putative class members established that those employees either always took their breaks or made the

12  conscious decision to forgo them even though they were offered, however, they cite no evidence in

13  support of this contention.  (*See* Oppo. at 13:1-5.)  GNC's citation to other cases where class

14  treatment was rejected does not substitute for actual evidence, especially in light of the fact-specific

15  nature of those decisions.[8]  *Cf., e.g., Campbell v. Best Buy Stores, L.P.*, No. LA CV12-07794 JAK,

16  2013 WL 5302217, at *12 (C.D. Cal. Sept. 20, 2013) (employer's adherence to its formal policy of

17  permitting meal and rest breaks bolstered by evidence that it had paid over $27,000 in meal break

18  premiums as required by the statute).  Nor does GNC's unsupported "rogue manager" argument

19  outweigh plaintiffs' evidence of uniform policies and practices presenting common legal questions

20  here.

21      In sum, the Court finds that Plaintiffs have met their burden to submit common evidence

22  linking GNC's unlawful policies to missed breaks for which no premium was paid, and certification

23  of the Meal Break and Rest Break subclasses is appropriate.

24      ────────────

25      [8] GNC cites *Hernandez v. Chipotle Mexican Grill, Inc.* for the proposition that liability
cannot be established without knowing the reasons a break was missed.  (*See* Oppo. at 14:3-11.)
26  However that decision was ordered depublished and unciteable after the California Supreme Court's
decision in *Brinker.  Hernandez v. Chipotle Mexican Grill, Inc.*, 208 Cal. App. 4th 1487, 146 Cal.
27  Rptr. 3d 424 (2012), *as modified (Sept. 25, 2012), review denied and ordered not to be officially
published (Dec. 12, 2012).*  GNC's counsel is cautioned against citing depublished authorities in the
28  future.

### 3. *Reimbursement Subclass*

Plaintiffs define their proposed Reimbursement Subclass as employees "who worked at least one closing shift and who used an automobile to make a bank deposit." California Labor Code section 2802(a) provides, in pertinent part: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." Necessary expenditures or losses include "all reasonable costs." *Id.* § 2802(c). Ascertaining whether an expenditure was necessary requires "an inquiry into what was reasonable under the circumstances." *Grissom v. Vons Companies, Inc.*, 1 Cal. App. 4th 52, 58 (1991). For purposes of section 2802, "before an employer's duty to reimburse is triggered, it must either know or have reason to know that the employee has incurred an expense. Once the employer has such knowledge, then it has the duty to exercise due diligence and take any and all reasonable steps to ensure that the employee is paid for the expense." *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009). Labor Code section 2804 renders null and void any "contract or agreement" purporting "to waive the benefits of" section 2802.

Plaintiffs' claim is based on GNC's failure to reimburse class members for mileage incurred by employees who worked a closing shift and drove nightly deposits to the bank as required by GNC. Plaintiffs contend that GNC's policies only tell putative class members that they are "eligible" for reimbursement. More significantly, plaintiffs offer evidence that GNC adopted a policy of only paying reimbursement "if the bank is not directly on the employee's route home." (Joint Cert. Decl., Exh. 33 [March 3, 2005 memorandum from Director of Compensation to sales directors and vice president stating that "Employees who drive to a bank to make a deposit at the end of the day should be paid for hours worked. Mileage must also be reimbursed if the bank is not directly on the employee's route home."]; Exh. 34 [June 8-9, 2009 email chain from regional sales director to GNC upper management inquiring whether reimbursement for trips to the bank is required, and response that "If the bank is not on the employee's regular route home then we are required to pay for mileage."].) The legality of such a limitation on reimbursement presents a question common to employees who were required to drive deposits to the associated bank.

In evidence are the locations of all stores and the distances between those stores and associated banks where deposits were required to be brought by the closing shift employee. (Joint Cert. Decl., Exh. 38.) Plaintiffs also submit evidence that during the class period only 17 people filed reimbursement requests even containing the word "bank." (Joint Cert. Decl. ¶ 30.)

The Court finds that plaintiffs have established the predominance of common questions based on a GNC's common policy to limit reimbursement for mileage for end-of-shift bank deposits, supported by evidence of the exceedingly small percentage of employees who sought reimbursement. The location of individual stores relative to the banks, and the mileage incurred, can be made on a class-wide basis. There is no question that taking the deposit to the bank was necessary. If employees drove the deposit to the bank, presumably the expense incurred in that drive was likewise necessary, regardless of whether it was or was not "on the employee's route home." GNC offers no evidence to suggest that individualized defenses would overwhelm the questions common to the proposed class as defined, *i.e.,* employees "who worked at least one closing shift *and who used an automobile to make a bank deposit*." The Court therefore **GRANTS** plaintiffs' Certification Motion as to the Reimbursement Class.

### 4.    *Final Pay Subclass*

Plaintiffs define their proposed Final Pay Subclass as employees who were: (1) involuntarily terminated (or "discharged") and not paid final wages immediately; or (2) voluntarily terminated (or "quit") and not paid final wages within 72 hours of termination. California Labor Code section 201 requires that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Labor Code section 202 states:

> [i]f an employee . . . quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting. Notwithstanding any other provision of law, an employee who quits without providing a 72-hour notice shall be entitled to receive payment by mail if he or she so requests and designates a mailing address. The date of the mailing shall constitute the date of payment for purposes of the requirement to provide payment within 72 hours of the notice of quitting.

16

Labor Code section 203 provides that, if an employer willfully fails to pay wages due under sections 201 or 202, the wages of the employee shall continue as a penalty from the due date at the employee's usual rate until the wages owed are paid but not more than 30 days.  An employer may pay wages earned and unpaid at the time the employee is discharged or quits by making an electronic direct deposit, so long as the employer does so within the time required by Section 201 and 202.  Labor Code section 213.  Labor Code section 219 "prohibits an employer and employee from agreeing, even voluntarily, to circumvent provisions of article I (consisting of §§ 200–243) of the Labor Code…[such that] agreement[s] *prospectively* waiving an employee's rights under sections 201 [and 202] to receive all his or her earned but deferred or unpaid wages...constitute...waivers which section 219 renders illegal and unenforceable."  *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610, 619 (2009) (emphasis in original).

Plaintiffs base their Final Pay Subclass claims for section 203 waiting time penalties upon several alleged legal violations: (1) uncompensated off-the-clock work; (2) unpaid meal and rest break premiums; and, independent of these, (3) their theory that GNC has adopted policies to circumvent Labor Code sections 201, 202, and 203.

As to the last of these theories, Plaintiffs cite evidence of a policy, in the form of an email from GNC's employee relations manager Kenneth Wunschel, directing managers as follows:

> Several states have regulations where terminated employees *are required to be paid their final pay outside of GNC's regularly scheduled paydays*. Depending on whether the termination is involuntary or voluntary determines when an employee is to receive their final paycheck.  Attached is a listing of these states with special requirements...

> When involuntarily terminating an employee, *we recommend that you suspend the employee to request the final paycheck*.  You can then schedule the employee to return on the date that you will receive the final paycheck from Payroll.  Allowing 3 days from the date of suspension (not counting the day of suspension) will give Payroll adequate time to send the final paycheck to the store….

> Employees who voluntarily terminate their employment can be handled in several ways.  If a resignation notice is given, contact the appropriate Payroll Processor immediately to coordinate the timing for what the last scheduled workday will be.  If an employee resigns effective immediately, *contact your Payroll Processor as soon as possible to request the final check.*

United States District Court
Northern District of California

(Joint Cert. Decl., Exh. 30, the "Wunschel email," emphasis supplied.)  In addition, and despite the Wunschel email's apparent purpose of avoiding late payment penalties, plaintiffs submit GNC records indicating a systematic failure to provide final paychecks timely.  As evidence of GNC's non-compliance with these Labor Code provisions, Plaintiffs offer a spreadsheet produced in discovery by GNC which sets forth the termination date and final paycheck date for all terminated Class Members.  Analysis by Plaintiff's expert, Dr. Kane, found that GNC issued paychecks for final wages an average of 10.53 days after termination, and over 80% of terminated Class Members were not issued paychecks within 72 hours.  (Joint Cert. Decl., Exh. 37.)  Although not part of Dr. Kane's analysis, GNC also has data from which it can determine whether the Class Members' terminations were voluntary or involuntary.  Thus, Plaintiffs contend, GNC has a systematic policy of failing to pay wages timely upon termination that can be proven on a classwide basis.

GNC argues that the Wunschel email does not truly reflect GNC's policy and that it has no uniform policy for issuing paychecks to employees who were discharged, since the decision to terminate and the reasons for termination are highly individual.  (Declaration of Paul Katz, Division Sales Director, at ¶ 7.)  As to the voluntarily terminated employees, GNC maintains that it has no uniform policy or practice either, but instead "has to wait for employees to inform their store managers how they would like to receive their check."  (Katz Decl. at ¶ 8.)  In addition, as to both employees who quit and those who were fired, GNC's evidence states that it "pays [some] employees with electronic direct deposit" and that those employees are "typically compensated" or "elect" to receive their paychecks "on the next applicable pay date."  (Katz Decl. at ¶¶ 7-8.)

The Court concludes that plaintiffs have carried their burden to demonstrate that common questions predominate with respect to involuntarily discharged employees and to a subset of the proposed voluntary discharge class who were paid by direct deposit.  Liability to the discharged employees can be determined from the data showing failure to pay upon discharge, along with a policy suggesting that GNC was willful in its efforts to circumvent the statute's requirements of immediate payment at the time of discharge by including a period of suspension to allow its payroll department to prepare a final paycheck.  Thus, the liability question for involuntary terminations presents a "corporate-level' issue" amenable to class treatment.  *Cf. In re Wal-Mart Stores, Inc.*

United States District Court
Northern District of California

1   *Wage & Hour Litig.*, C 06-2069 SBA, 2008 WL 413749, at *11 (N.D. Cal. Feb. 13, 2008).  The

2   evidence offered by plaintiffs supports an inference that GNC had a common approach to handling

3   final wage payments for involuntarily terminated employees, and that liability for failure to pay

4   timely is susceptible to common proof.

5          Similarly, liability to the employees who quit and were paid by direct deposit may be

6   determined on a classwide basis.  GNC's own evidence indicates that, for those employees receiving

7   checks by direct deposit, it paid final wages due at the next regular pay date, rather than paying

8   immediately or within 72 hours.  Labor Code 213 requires that payments of final wages made by

9   direct deposit comply with sections 201 and 202, *i.e.,* payment must be made immediately upon

10  termination or within 72 hours.  An employee's "election" in these circumstances would not affect

11  liability, since any claimed election to receive a final paycheck later than specified by the statute

12  would prohibited by Labor Code section 219.  *Cf. Pena v. Taylor Farms Pac., Inc.*, No. 2:13-CV-

13  01282-KJM-AC, 2013 WL 5703505, at *4 (E.D. Cal. Oct. 15, 2013) (Section 213 "imposes no

14  obligation on either the employer or the employee… if an employee authorizes direct deposit… then

15  the employer may choose to make final payment via deposit, provided the employee does not

16  specifically request payment via mail).  GNC's arguments against certification based upon "waiting

17  for a designation" from the employee do not apply to this group.  Thus, the question of whether

18  GNC may provide final pay later than the statutory time requirements if it pays wages due by direct

19  deposit at the next applicable pay date, and whether employees can waive the time requirements by

20  "electing" direct deposit, are common questions susceptible to class treatment.

21          The situation is different with respect to those employees who quit and did not receive their

22  paychecks by direct deposit.  For this subgroup, GNC's arguments about "waiting for a designation"

23  would appear to generate individualized issues that preclude class treatment.  Various district courts

24  have found that California Labor Code sections 208 and 212, read together with section 202, impose

25  upon employees an obligation to demand tender of payment by returning to their place of

26  employment within 72 hours of quitting, or to designate a mailing address for delivery of their final

27  paycheck in order to state a claim.  *See In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, C 06-2069

28  SBA, 2008 WL 413749, at *3, *8 (N.D. Cal. Feb. 13, 2008) (denying class certification of final

United States District Court
Northern District of California

1    paycheck claim for employees who quit, citing to an opinion of the California Division of Labor

2    Standards that section 208 requires a quitting employee to return to the employer to collect wages

3    due and no waiting time penalties would accrue if the employee failed to do so); *Moreno v.*

4    *Autozone, Inc.*, No. CV 05-4432 CRB, 2009 WL 3320489, at *3 (N.D. Cal. Oct. 9, 2009) *aff'd,* 410

5    F. App'x 24 (9th Cir. 2010) (finding no standing of individual class representative due to lack of

6    evidence of fulfillment of employee's obligation to demand paycheck or specify delivery; vacating

7    class certification); *Pena*, 2013 WL 5703505, at *4 (granting motion to dismiss class claim for

8    waiting time penalties based on lack of pleading choice of tender or delivery by mail).  As stated in

9    *In re Wal-Mart*, 2008 WL 413749 at *8, "whether and when waiting time penalties attach will

10   depend, for each employee, on… whether or when they either returned to the store to pick up their

11   final pay or provided [the employer] with an address to send it."  Thus, for those employees who did

12   *not* receive paychecks by direct deposit, individual issues regarding tender and designation would

13   preclude a classwide determination of liability.  The Court notes that none of these cases addressed

14   an employer policy to pay make final wage payments by direct deposit at the next regular pay date,

15   as here.

16        The Court therefore **GRANTS IN PART** plaintiffs' certification Motion as to the Final Pay

17   Subclass, which it defines as including those employees who were: (1) involuntarily discharged and

18   not paid final wages immediately; or (2) enrolled in direct deposit, voluntarily terminated/quit, and

19   not paid final wages immediately or within 72 hours of termination.[9]  Class certification is **DENIED**

20   as to those employees in the proposed Final Pay subclass who quit and were not enrolled in direct

21   deposit due, given the evidence that individual designation issues would overwhelm the common

22   issues.

23

24

25        [9] Also, to the extent these same employees had missed meal and rest breaks for which they
     were required to be compensated, that final pay would still be due and owing to those employees
26   and susceptible to proof on a class-wide basis.  *See Bradley, supra*, 211 Cal. App. 4th at 1156
     (plaintiffs' waiting time penalties claims based on unpaid meal and rest break premiums entitled to
27   certification).

28

United States District Court
Northern District of California

### 5.     *Off-the-Clock and Records Subclasses*

The proposed Off-the-Clock Subclass encompasses employees "who worked at least one closing shift" during the class period.[10]  Here, the violation at issue is based upon Paragraph 2(G) of applicable Wage Order.  The Wage Order defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

To prove their off-the-clock claim, plaintiffs must demonstrate that class members worked hours for which they were not paid and GNC was aware, or should have been aware, that class members were performing work for which they were not paid.  *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1051 (2012) (employer's liability for off-the-clock work "is contingent on proof [the employer] knew or should have known off-the-clock work was occurring"); *see also Ortiz v. CVS Caremark Corp.*, C-12-05859 EDL, 2013 WL 6236743, at *9 (N.D. Cal. Dec. 2, 2013).  Where the evidence establishes a formal policy prohibiting off-the-clock work, plaintiffs must present "substantial evidence of a systematic company policy to pressure or require employees to work off the clock."  *Brinker*, 53 Cal. 4th at 1051.  Being clocked out "creates a presumption [employees] are doing no work," which presumption plaintiffs must rebut to demonstrate an employer's liability for unpaid work.  *Id.*

Here, GNC maintains formal policies requiring that all employees be paid for all time worked, prohibiting employees from working off-the-clock, and requiring employees to record all time worked.  GNC submitted a number of written policies requiring that employees record and be paid for all hours worked.  (Joint Cert. Decl., Exh. 32, GNC employee handbook ["All time worked by associates must ALWAYS be recorded exactly as it has occurred."]; Katz Decl., Exh. B [sample poster containing GNC policies ["It must be understood that there should never come a time when

---

[10]  Plaintiffs define the Records Subclass as coextensive with the Off-the-Clock Subclass.  Both hinge on the notion that GNC "predetermines hours worked," and thereby fails to pay for and record all hours worked.  The merits and the suitability for class treatment of the Records Subclass depend upon the viability of the Off-the-Clock Subclass, and the Court considers them in conjunction with one another.

you are working off the clock!  All hours of work must be documented every day!"], Exh. C [same], Exh. F, GNC Retail Operations Manual ["All store employees, regardless of position, must accurately record and be paid for all hours worked."]; Scott Decl. ISO Cert. Opp'n ¶ 4, Exh. C, GNC management training guide ["Ensure that employees are recording hours properly on a daily basis. Remember that employees, including you as the manager, must be paid for all hours that are actually worked.  Be sure to review hours on a daily basis. . . . All hours worked must be recorded and approved by the manager in compliance with state and federal regulations."], Exh. D, GNC Human Resources Manual's Overtime Policy ["All hours worked are to be reported regardless of prior approval.  Any manager or supervisor who purposely encourages her/his non-exempt employees to claim fewer hours than those actually worked may face disciplinary action up to and including termination."].)  GNC's formal policy prohibiting off-the-clock work was disseminated widely within the company.  GNC allowed managers to correct the timecards of employees whose closing duties took more time than estimated when they clocked out, though employees had to tell their managers about any overage.  GNC also required employees to verify the accuracy of their timecards on a weekly basis.  And, significantly, GNC's POS system automatically prompts closing shift employees to enter a future clock-out time to account for the additional time required to complete closing tasks.  (Scott Decl., Exh. C at GNCB-10001938; Exh. D at GNCB-10004431.)

Plaintiffs do not dispute the existence of these policies and procedures.  Rather, plaintiffs contend that GNC's stated policy of paying for all hours worked is merely "nominal," and that the policy which controls the amount of work for which GNC will pay is its so-called "predetermined hours" policy.  As evidence of this "predetermined hours" policy, plaintiffs cite GNC's Employee Handbook which states:

> Employees may only work hours which are scheduled or otherwise authorized.  Working extra time not scheduled or not specifically authorized or not occasioned by a bona fide emergency is a violation of policy.

(Joint Cert. Decl., Exh. 32, at GNCB-10002960.)  Plaintiffs contend that this policy of allowing employees to work only at "scheduled" or "authorized" times resulted in class members performing closing duties after their scheduled clock-out time, and thus not being paid for that work.  They also

United States District Court
Northern District of California

offer evidence that GNC emphasized strongly to store managers that they were to implement schedules to keep within the store's clerical hours budget, and to adhere to those schedules. (Scott Decl. Exh. B at GNCB-10000054, Exh. C at 1001934-36; Joint Cert. Decl., Exh. 45 ["any manager overusing clerical hours is to be dealt with through disciplinary action"].) Plaintiffs argue that GNC's policies of limiting labor hours at each store, prohibiting managerial employees from exceeding their budgeted or scheduled employee hours, and requiring bank deposits to be made after class members clocked out led to unlawful off-the-clock work.

At first glance, the basis for plaintiffs' claim of off-the-clock work appears uniform: GNC required all closing shift employees to complete additional work after they logged out of the POS system at the end of the day, such that GNC knew "off-the-clock" work would take place. However, GNC has submitted evidence that it accounted for that time by having employees estimate a clock-out time, *i.e.* additional time to account for what would otherwise be off-the-clock work.[11] Thus, whether and why class members worked off-the-clock becomes less a question of common policy and more a matter of individualized inquiry.

The evidentiary record underscores the lack of a unitary answer to liability questions arising from class members making bank deposits after logging out of the POS. Plaintiffs offer two key types of evidence to satisfy their burden of showing the predominance of common questions: (1) some 80 declarations supplied by named plaintiffs and class members (Joint Cert. Decl., Exh. 36; Supp. Joint Cert. Decl., Exhs. 39-41); and (2) an expert report by statistical consultant Dr. Jeffrey S. Kane (*Id.*, Exh. 37 ("Kane Report")). Plaintiffs' proffered declarations were obviously prepared by counsel, and rely on certain stock language repeated across declarations. This is not reason in and of itself to doubt the veracity of the declarant. However, this evidence carries less weight than spontaneous statements made putative class members' depositions, particularly where the deposition testimony is at odds with the declaration. Some deponents testified to making bank deposits on the

---

[11]  Plaintiffs contend that GNC's estimated time argument is contradicted by its Retail Operations Manual and the testimony of its Director of Employee Relations which do not allow employees to enter estimated/future time. The evidence to which plaintiffs cite for these contentions does not support them. (*Cf.* Depo. Emrick at 19:18-24 and 39:9-40:2; Depo. Inlow, Exh. 9 at ROM at GNCB-10000096.)

clock and to having managers who would modify time records to reflect the extra time if their estimate of post-clock-out duties proved insufficient to cover the time actually worked.  (*See generally* Germaise Decl. ISO Cert. Opp'n, Exh. E ("Gregory Depo."), Exh. F ("Dehghany Depo."), Exh. G ("Nayebi Depo."), Exh. J ("Testa Depo.").)  For instance, store associate Christopher M. Gregory testified that he generally would "clock out ahead of time" to "[g]ive [him]self time to go to the bank," and that if it "took longer than the 30 minutes they gave me to close and get there," he "would normally call [his] manager and let him know" how to adjust his clock-out time.  (Gregory Depo. at 7:23-8:2; 11:20-12:25.)  Other GNC employees testified to the same effect.  (Dehghany Decl. at 11:3-11, 14:14-15:11, 33:3-34:5; Nayebi Depo. at 18:24-19:25, 28:12-21, 39:4-22, 41:9-42:13; Testa Depo. at 7:17-8:6, 9:10-11:24, 19:21-20:14, 37:8-24.)  The deposition testimony suggests that GNC generally expected employees to complete closing tasks within 30 minutes. Beyond that, the testimony evinces a variety of approaches to off-the-clock work employed by different managers employed at different stores at different times throughout the class period.

Plaintiffs' expert Dr. Kane undertook a statistical analysis of GNC's computerized records of employee clock-out times.  (Kane Report at 2.)  Dr. Kane noted GNC's contention that employees on the closing shift enter their "estimated end time" into the POS.  He opined that, if those estimated times reflected the hours they actually worked, rather than a time dictated by GNC, "the statistical expectation is that there would be a 'normal distribution' around the store closing times, allowing additional time for completion of closing duties."  (Kane Report, ¶19.)  Kane found, instead, a "distribution [that] is excessively leptokurtic, meaning the frequency with which a particular time… entry occurs is a rate far exceeding that which would be expected in a normal distribution."  (*Id.*)  Dr. Kane opined that this distribution of clock-out times "evidences an external systematic influence to require Class Members to enter…clock outs at a specific time dictated by GNC instead of the time they actually estimate to be done working." (*Id.*)

Plaintiffs' evidence tends to show a GNC policy requiring employees to finish their closing duties within 30 minutes, and requiring store managers to allot employee hours so that GNC did not pay overtime.  Certainly, this combination of circumstances *could* create incentives to "work off the clock or to permit or require off-the-clock work."  *Koike v. Starbucks Corp.*, C 06-3215 VRW, 2008

United States District Court
Northern District of California

WL 7796650, at *8 (N.D. Cal. June 20, 2008) *aff'd*, 378 F. App'x 659 (9th Cir. 2010).  However, as the *Koike* court found, evidence of such incentives alone does not establish a common issue for class certification, since it provides no common answer to the question of whether individual employees or managers *yielded* to those incentives, despite GNC's formal policy to pay for all time worked. GNC's policies and efforts to keep clerical hours within budget are not enough to establish "substantial evidence of a systematic company policy to pressure or require employees to work off the clock" as required under *Brinker*.

Even assuming the presence of such incentives, the Court would be left with numerous individualized inquiries necessary for a determination of liability, including whether employees actually exceeded their allotted 30 minutes; whether managers modified time records to account for all time worked; and, if they did not, whether GNC knew or should have known.  Proving that the incentives identified by plaintiffs resulted in off-the-clock work "could not be done with statistical or survey evidence but only with detailed inquires about each employee claimed to have done so and her manager's knowledge thereof."  *Ortiz v. CVS Caremark Corp.*, C-12-05859 EDL, 2014 WL 1117614, at *4 (N.D. Cal. Mar. 19, 2014).  The Court would have to conduct individualized inquiries into the conditions at each GNC store under each manager who worked there during the class period.  These individualized inquiries would predominate over the common question of whether GNC's policy of strictly budgeting labor hours led to off-the-clock work.  *Cf. Abdullah*, 731 F.3d at 964 (affirming certification of class where a common staffing model was at issue and no "site-by-site" inquiry was required).

In light of the evidence of individual employees' ability to estimate and correct time after their closing log-out, and the individualized issues presented, Plaintiffs' "predetermined hours" theory does not persuade.  The predominance of individualized inquiries makes certification of plaintiffs' proposed Off-the-Clock Subclass, and the derivative Records Subclass, inappropriate. Consequently, the Court **DENIES** plaintiffs' Certification Motion as to their proposed Off-the-Clock and Records Subclasses.

United States District Court
Northern District of California

### 6.   *Unfair Competition Class*

Plaintiffs' UCL claim is derivative of their other alleged statutory violations, discussed above.  Because the proposed Unfair Competition Class would be coextensive with those California claims certified for class treatment herein, there does not appear to be a need to certify a separate class.  Rather, the UCL's statute of limitations simply applies to the class period for the other certified class and subclasses.  The motion to certify is therefore **DENIED** as moot with respect to the Unfair Competition Class.

## III.   **GNC'S DECERTIFICATION MOTION**

Plaintiffs' FLSA claim seeks unpaid overtime arising from the same conduct that alleged in connection with its proposed Off-the-Clock Subclass, *i.e.*, that employees were required to "to clock out at the scheduled end of their shift regardless of whether the 'closing duties' were complete and perform bank deposits in their own vehicles after they had clocked out and left their store."  (TAC ¶ 72.)  GNC now moves to decertify the collective action the Court previously granted preliminary certification on January 7, 2013.

### A.   **APPLICABLE STANDARD**

While Rule 23 authorizes class actions where common questions of law and fact predominate in the cases of numerous individual plaintiffs, the FLSA, in contrast, applies a different principle for authorizing mass litigation, permitting plaintiffs to sue on behalf of any persons "similarly situated."  *Compare* Fed. R. Civ. P. 23(b)(3) *with* 29 U.S.C. 216(b); *see also Lillehagen v. Alorica, Inc.*, SACV 13-0092-DOC, 2014 WL 2009031, at *6 (C.D. Cal. May 15, 2014) ("Congress clearly chose not to have the Rule 23 standards apply to [Section] 216(b) collective actions[.]") (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001); *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009)).  Hence, "collective actions under the FLSA are not subject to the requirements of Rule 23 . . . ."  *Hill v. R+L Carriers, Inc.*, C 09-1907 CW, 2011 WL 830546, at *3 (N.D. Cal. Mar. 3, 2011) (citing *Thiessen*, 267 F.3d at 1105).  Rather, an FLSA-specific, fact-intensive inquiry into whether plaintiffs are "similarly situated" governs.  "The FLSA does not define the term 'similarly situated,' nor has the Ninth Circuit defined it."  *Santiago v. Amdocs, Inc.*, C 10-4317 SI, 2013 WL 5444324, at *3 (N.D. Cal. Sept. 30, 2013)

United States District Court
Northern District of California

1    (Illston, J.).  However, multiple courts "have held that FLSA's 'similarly situated' standard is less

2    stringent than Rule 23(b)(3)'s requirement that common questions of law and fact predominate."  *Id.*

3    at *8 (quoting *Hill*, 2011 WL 830546, at *3).

4        To determine whether plaintiffs are "similarly situated," courts in this circuit have applied a

5    "two-step approach involving initial notice to prospective plaintiffs, followed by a final evaluation

6    whether such plaintiffs are similarly situated."  *Leuthold v. Destination America, Inc.,* 224 F.R.D.

7    462, 467 (N.D. Cal. 2004).  "The first step under the two-tiered approach considers whether the

8    proposed class should be given notice of the action.  This decision is based on the pleadings and

9    affidavits submitted by the parties.  The court makes this determination under a fairly lenient

10    standard due to the limited amount of evidence before it…. In the second step, the party opposing

11    certification may move to decertify the class once discovery is complete and the case is ready to be

12    tried."  *Adams v. Inter-Con Sec. Systs., Inc.,* 242 F.R.D. 530, 535-56 (N.D. Cal. 2007).  This Court

13    applied the lenient stage-one standard when it certified the FLSA Class in January 2013.

14        At step two of the process, which occurs at the conclusion of discovery, courts engage in a

15    more searching review.  *Leuthold,* 224 F.R.D. at 467.  At this stage, to overcome a motion to

16    decertify a conditionally certified class, "it is *plaintiffs'* burden to provide *substantial evidence* to

17    demonstrate that they are similarly situated."  *Reed v. County of Orange,* 266 F.R.D. 446, 449 (C.D.

18    Cal. 2010) (emphasis supplied); *see also O'Brien v. Ed Donnelly Enters., Inc.,* 575 F.3d 567, 584

19    (6th Cir. 2009) (plaintiffs bear burden of showing that opt-in plaintiffs are similarly situated); *Hill*,

20    2011 WL 830546, at *3 (same).  At this second stage, "[l]ogically the more material distinctions

21    revealed by the evidence, the more likely the district court is to decertify the collective action."

22    *Anderson v. Cagle's Inc.,* 488 F.3d 945, 953 (11th Cir. 2007).

23        In deciding whether plaintiffs have met their stage-two burden, courts undertake a fact-

24    specific inquiry into three factors.  *Reed,* 266 F.R.D. at 449.  "These factors include: (1) the

25    disparate factual and employment settings of the individual plaintiffs; (2) the various defenses

26    available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural

27    considerations."  *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F. Supp. 2d 1111, 1118 (N.D. Cal.

28    2011).  Further, courts in several circuits, including this one, evaluate whether plaintiffs have

provided substantial evidence that their claims arise out of a *single* policy, custom, or practice that led to FLSA violations. *Reed,* 266 F.R.D. 446 at 450; *see also Beauperthuy,* 772 F. Supp. 2d at 1118 (collecting cases). Nevertheless, under the plain language of the FLSA, plaintiffs "must only be similarly—not identically—situated to proceed collectively." *Falcon v. Starbucks,* 580 F. Supp. 2d 528, 534 (S.D. TExh. 2008). Ultimately, the question of whether to proceed as a collective action "turns on whether this device is the superior way of resolving a controversy. The benefits to the parties of a collective proceeding need to be balanced against any prejudice to [the defendant] and any problems of judicial administration that may surface." *Beauperthuy,* 772 F. Supp. 2d at 1118 (quoting *Campanelli v. Hershey Co.*, C 08-1862 BZ, 2010 WL 3219501, at *5 (N.D. Cal. Aug. 13, 2010) (Zimmerman, J.)). Resolution of that question rests within the sound discretion of the district court. *See, e.g., Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213 (5th Cir. 1995).

   **B.   ANALYSIS**

   "When determining whether a plaintiff has met its burden of producing substantial evidence to show that putative class members are similarly situated, the first factor courts consider is the degree of similarity among plaintiffs' factual and employment settings." *Beauperthuy*, 772 F. Supp. 2d at 1122 (citing *Reed,* 266 F.R.D. at 449). When conducting this inquiry, courts consider such factors as whether plaintiffs had differing job titles or duties, differing salaries, worked in different geographic locations, worked under different supervisors, or allege different types of unlawful conduct. *Reed,* 266 F.R.D. at 449; *Moss v. Crawford & Co.,* 201 F.R.D. 398, 409 (W.D. Pa. 2000); *Molina v. First Line Solutions LLC,* 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007).

   Here, the same reasons that militated against certification of plaintiffs' proposed Off-the-Clock Subclass militates in favor of granting GNC's Decertification Motion. The evidence suggests that off-the-clock work occurred, if at all, at the behest of managers incentivized to reduce labor costs and stay inside their budget allotments. The evidence also suggests that whether an employee was subjected to off-the-clock work depended on a variety of individualized factors, paramount among them the identity of the manager under whom they worked. Such employees are not similarly situated in that they are required to work unpaid overtime, if at all, as a result of individual

1    managers' decisions as opposed to a single corporate policy.  Indeed, the record reflects that GNC

2    pays overtime when worked.

3             The record discloses another reason why the FLSA Class is subject to decertification.  The

4    FLSA requires overtime pay for time worked in excess of 40 hours in a workweek.  29 U.S.C. §

5    207(a)(1).  That is, the FLSA imposes an overtime premium only when hours exceed the 40-hour

6    threshold on a *weekly basis only*, unlike California's daily overtime provisions.  *Cf.* Cal. Lab. Code

7    § 510(a).  Thus, the 40-hour threshold is not only a baseline for damages, but an element of liability.

8    As plaintiffs acknowledge, they are entitled to recover for unpaid overtime hours worked by the

9    FLSA opt-in plaintiffs only to the extent that such hours exceeded 40 hours per week.  (Decert.

10   Opp'n at 11.)

11            In this case, the record discloses that the FLSA opt-in employees worked a variety of

12   schedules, some of which brought them close to the 40-hour threshold, but many of which left them

13   far short, working, for instance, 20 to 30 hours per week.  Named plaintiff Brewer falls into the

14   former category.  (*See* FLSA Cert. Order at 2.)  As the Court set forth in its Preliminary Order,

15   Brewer was typically scheduled to work 35 to 40 hours per week, but alleges that he routinely

16   worked over 40 hours per week without receiving overtime pay.  (*Id.*)  However, a significant

17   number of opt-ins fall into the latter category, in that they typically were scheduled far fewer hours

18   per week.  For this set of GNC employees, even several hours of unpaid work per week would fail to

19   carry them across the 40-hour threshold.  Contrary to plaintiffs' contention, this is not merely a

20   matter of damages, but is an element of liability in the first instance.  Thus, the varying schedules of

21   opt-in plaintiffs supply a separate reason why the FLSA Class previously certified by the Court

22   warrants decertification.

23            Though the factors examined above suffice to dictate decertification, the Court additionally

24   finds that individualized defenses would stymie collective resolution of the FLSA opt-in plaintiffs'

25   claims.  As GNC persuasively argues, even assuming some employees did accrue unpaid overtime,

26   GNC could assert defenses barring liability on account of the employees' failure to follow

27   established procedures for correcting their time records, their verification of weekly time records

28   that did not reflect these hours, and/or the *de minimis* amount of overtime that went uncompensated.

United States District Court
Northern District of California

1 | *See Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (no liability where

2 | employee fails to notify employer of overtime); *Lindow v. United States*, 738 F.2d 1057, 1062-63

3 | (9th Cir. 1984) (no liability were overtime is *de minimis*); *Creely v. HCR ManorCare, Inc.*, 920 F.

4 | Supp. 2d 846, 851 (N.D. Ohio 2013) (no liability where employee fails to follow process to correct

5 | time records).)  Each of these defenses would, on the facts presented here, require individualized

6 | inquiries and thereby defeat any economy arising from the form of a collective action.

7 | Finally, the Court finds that fairness and procedural considerations do not support

8 | maintenance of the preliminarily certified class.  In sum, the Court finds that plaintiffs have not met

9 | their burden to show that opt-in plaintiffs are similarly situated with respect to their accrual of

10 | unpaid overtime such as would render collective trial of this action unmanageable.

11 | For all these reasons, the Court **GRANTS** GNC's Decertification Motion.

12 | **III.     CONCLUSION**

13 | A.      For the reasons set forth above, plaintiffs' Motion for Certification of California

14 | Class Claims is **GRANTED IN PART AND DENIED IN PART**.  The Court finds the following classes

15 | and subclasses appropriate for class treatment under Rule 23:

16 | 1. **Wage Statement Class:** All non-exempt hourly employees of GNC who worked as Sales

17 | Associates and/or Assistant Managers in California from July 21, 2007, to the present.

18 | 2. **Meal Period Subclass:** All members of the Wage Statement Class whose "punch data"

19 | reveals at least one untimely, truncated and/or missed meal period.

20 | 3. **Rest Period Subclass:** All members of the Wage Statement Class whose "punch data"

21 | reveals at least one untimely, truncated and/or missed rest period.

22 | 4. **Reimbursement Subclass:** All members of the Wage Statement Class who worked at

23 | least one closing shift and who used an automobile to make a bank deposit.

24 | 5.  **Final Pay Subclass:** (a) All members of the Wage Statement Class whose employment

25 | was involuntarily terminated and who were not paid final wages immediately; and (b) All members

26 | of the Wage Statement Class who quit, were paid by direct deposit, and were not paid final wages

27 | immediately or within 72 hours.

28 |

The Court finds that the above Class and Subclasses meet all requirements of Rule 23, and that the interests of the Class and Subclasses will be adequately represented by Class Representatives Charles Brewer, Jessica Bruns, Michael Mitchell, Michael Murphy, and Wayne Neal, and by their counsel, Hoffman Employment Lawyers.

The Motion for Certification is **DENIED** as to Plaintiffs' proposed Off-the-Clock and Records Subclasses.

The Motion for Certification is **DENIED AS MOOT** as to the proposed Unfair Competition Class, which is redundant of the Class and Subclasses certified by the Court.

B.      For the reasons set forth above, GNC's Motion to Decertify the FLSA Collective Action is **GRANTED**.  The Court **ORDERS** that the FLSA collective action is decertified.

C.      The Court **SETS** a case management conference for **December 15, 2014, at 2:00 p.m.** This Order terminates Dkt. Nos. 106 and 168.

**IT IS SO ORDERED**.

Dated:  November 12, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California